## STATE v. MORRIS.

No. 4580. Decided November 25, 1927. (262 P. 107.)

*H. L. Pratt*, of Price for appellant.

*Harvey H. Cluff*, Atty. Gen., and *L. W. Miner*, Asst. Atty. Gen., for the State.

THURMAN, C. J.

The defendant was charged in the information, jointly with one George Snyder, with the larceny of 100 head of sheep in San Juan county, Utah, January 2, 1926. The defendant was given a separate trial in the district court of San Juan county, was convicted of the crime charged in the information, and sentenced to an indeterminate term in the state prison.

It is alleged in the information that the sheep were the personal property of the La Sal Live Stock Company, whose principal place of business was La Sal, Utah.

Defendant appeals from the judgment of conviction, and assigns as error the admission of evidence over his objection, errors in certain instructions to the jury, refusal of the court to instruct as requested by him, and insufficiency of the evidence to sustain the verdict. Defendant's motion for a new trial was overruled, which ruling is also assigned as error.

The La Sal Live Stock Company, at the date of the alleged crime, was the owner of two herds of sheep in San Juan county that were being herded in the vicinity of Lisbon Valley near the state line between Utah and Colorado. George Snyder, jointly charged with the defendant, was

also the owner of a herd of sheep being herded in the same vicinity. The herds of both owners were being operated back and forth so near to the state line between Utah and Colorado as to make it a serious question whether the acts charged as a crime were committed within the state of Utah.

It appears from the evidence that appellant was the camp mover or camp tender for George Snyder, and that Abelardo Vijil was herder for Snyder until February 3, 1926, at which time he was succeeded in that position by Antonio Lopez. It also appears that Charles Redd was manager for the La Sal Live Stock Company and Roque Garcia its sheep foreman, and that F. R. Lopez, Don Loveridge, and Silverado Sanchez were also in the employment of the company in operating its herds.

As before stated, the sheep were run in the vicinity of Lisbon Valley, San Juan county, and in the Western part of Colorado. The La Sal Company counted its sheep in October and December, 1925, and also on January 19, 1926, and found the number substantially correct. Early in March, 1926, they were counted again, and 102 head were found missing. A search was immediately instituted by the company for the missing sheep. The foreman in company with other employees went to the point where the sheep were counted in January and found tracks of a small bunch leading away from the main herd. They estimated there were about 100 head. They followed these tracks for several miles until they finally became merged in the tracks of a larger herd. Upon investigation they found it to be the Snyder herd. About 93 head of the La Sal Company's sheep were found in the herd with their earmarks altered, the wool clipped off, and a blotch brand of red paint where the wool had been clipped. The 93 head of sheep were identified partly by the grade and quality of the sheep and partly by occasional remnants of the La Sal Company's earmarks and brands which had not been entirely obliterated. The marks

and brands had apparently been made within a month or two previous. The earmarks had the appearance of having been made with a hot instrument, causing the ears to heal rapidly, and leaving the appearance of an old mark. Upon squeezing the ears, blood issued therefrom. No question was made as to the ownership of the sheep. They were delivered to Mr. Redd, as manager of the La Sal Live Stock Company, March 10, 1926. That the sheep were stolen by some person, or persons, hardly admits of doubt. As to who stole them, or who altered the marks and brands, the case is not so clear. The appellant when arraigned pleaded not guilty, and at no time has he, directly or indirectly, admitted his guilt.

Among other errors assigned, appellant insists that the evidence is insufficient to sustain the verdict. Before considering this feature of the case, however, we will dispose of the other errors relied on.

After the employees of the La Sal Company had tracked the stolen sheep into the Snyder herd, Mr. Redd and two or three others, including the sheriff of San Juan county, on the morning of March 10, 1926, visited the Snyder camp. Both Snyder and the appellant were there. Redd testified he said to them: "I guess you know what I come down for; we are looking for some sheep we are short." Snyder then said: "Charley, can I speak to you a minute?" Redd and Snyder then "went down to the trough." The witness was about to repeat what Snyder said, when appellant's counsel objected on the grounds that it was hearsay, immaterial, and incompetent; appellant not being present. The court sustained the objection on the ground that there was no evidence of concerted action between Snyder and appellant. Later on in the case, after considerable evidence had been introduced, the witness Redd was recalled and the question again asked as to what Snyder said when they went down to the trough. Appellant's counsel again objected, and the objection was overruled. The witness

answered the question. We here quote the answer and sub-sequent rulings:

"A. Well, George Snyder said, 'Are you sure you have lost some sheep?' and I said, 'I think we have; we are pretty sure of it.'

"Mr. Pratt: 'Now, will you state that slow, please? A. I wouldn't say those are the verbatim words; that is, not word for word.

"Mr. Pratt: 'Well, I understand you are giving it as you remember it.' A. Yes, sir.

"Mr. Pratt: 'And what was it you answered to that?' A. Well, I said, 'Yes; I think we are;' and he said, 'Would you be satisfied if you got your sheep?' and I said, 'Well, yes; I would be satisfied.' Up to that time the warrant hadn't been served on Mr. Snyder, and I says, 'Well, I couldn't say as to that; that will be up to the country or the authorities.' I said, 'Mr. Wilson has a warrant for your arrest;' and George said, 'Would you do what you could to stop that?' He said, 'You could stop it if you wanted to, or you could, or could you, or would you;' and I said, 'I don't know whether I could or not;' or else I said I didn't know whether I could or not. But the matter was more or less disposed of, whether I—

"Q. Is that all that was said? A. Yes; that is all I remember; there might have been something else; we talked a little over there about the location of the sheep, as I remember it."

Appellant contends that the admission of the evidence was prejudicial error for which the judgment should be reversed. The district attorney, in the court below, admitted that it was prejudicial, but insisted that it was not error because there was evidence tending to show a conspiracy between Snyder and appellant to commit the crime charged. The court below, in overruling the motion for a new trial, admitted that the admission of the evidence was error but held it was not prejudicial. The Attorney General, in his brief filed in the case, takes the position that neither the question propounded by the district attorney nor the answer thereto was prejudicial, but that the prejudicial evidence, if any, was elicited by appellant's attorney, for which neither the district attorney nor the court was responsible. It would be assuming an unnecessary burden to undertake an analysis of these conflicting views. While there is some force in the

position taken by the Attorney General, the truth is the witness went entirely beyond the question propounded by appellant's attorney and volunteered a statement not called for by the question. The fault of appellant's attorney was not in the question propounded by him, but in permitting the witness to volunteer a statement wholly irresponsive to the question. Having permitted the witness to volunteer the statement and failing to move that it be stricken, we do not feel warranted in holding that the state was responsible for the error. In 28 R. C. L. 592, 593, the rule is thus stated.

"If in the course of his examination a witness gives an answer that is not responsive to any question propounded to him, the trial court may exclude the answer from the consideration of the jury. If the answer is only partially irresponsive, that part may be excluded. And if a witness, in answer to a question that is legal, proper and not objectionable, states matter that is illegal and inadmissible as evidence, the trial court, on motion, should strike out the answer or so much of it as is improper and direct the jury to disregard it as evidence in the case. But it has been held that a party adverse to the examiner has no absolute right to have an answer expunged from the record merely because it is irresponsive. If the answer is competent and pertinent in itself, it is optional with the court to strike it out, and a denial of a motion to do so is no ground of error. The party examining the witness is not bound or precluded by the answer, and may himself object to its competency, although the person is his own witness. And he would seem to have an absolute right to have the irresponsive matter expunged, regardless of its competency. The error in a refusal to strike out an irresponsive answer to a proper question may be removed by the cross-examination of the objecting party. And, if no motion is made to strike out the objectionable answer, the reviewing court will not consider an assignment of error predicated thereon."

See, also, note, 15 Ann. Cas. at pages 1090, 1091.

If, in the instant case, the attorney for appellant had moved to strike that portion of the statement which was irresponsive to the question asked, the court would undoubtedly have granted the motion. The refusal to do so would have

been reversible error. *State* v. *James*, 32 Utah 152, at page 158, 89 P. 460. We are of opinion that as to this assignment appellant's contention is without merit.

Appellant also assigns as error certain instructions of the court and refusal to instruct as requested. These assignments are not of sufficient importance to justify specific mention. The more serious question is, Was the evidence sufficient to sustain a verdict of conviction?

As already stated, the evidence shows that appellant was the camp mover or camp tender of the Snyder herd. It does not appear that appellant was otherwise interested in the sheep. He moved the camp from time to time as necessity required, but was not classed as a herder of the sheep, as was Abelardo Vijil, prior to February 3, 1926, and Antonio Lopez, thereafter. There was no evidence in the trial of the case, either direct or circumstantial, to prove that appellant participated in altering the marks or brands on the sheep alleged to have been stolen; nor, in our opinion, was there any evidence from which it could be justly or reasonably inferred that appellant knew that the sheep had been stolen until he heard that the La Sal Live Stock Company had lost a bunch of sheep. This information, according to his testimony, was not received by him until two or three days before he was arrested. He testified that on February 4, 1926, he went to Delores to look for a horse belonging to Snyder; that while on that trip he met one Ed Williams, with whom he was acquainted, and Williams offered to sell him a small bunch of sheep, about 100 head; that he told Williams he had no money to buy sheep; that Williams then asked him if he thought Snyder would buy them; that he said he thought not as Snyder had no more money to buy sheep than he had. Witness asked Williams where he got the sheep, and Williams said he got them from August Nicholes. Williams then asked if he could put his sheep in the Snyder herd for a while, as his wife was to be

confined and he had to go home and take care of her. Witness said he guessed it would be all right. Williams then asked witness where the herd would be within four or five days. Witness told him where he thought it would be. The sheep Williams referred to were not present at that time and place. Witness reported the conversation to Snyder when they met a day or two afterwards. Witness thought no more of the matter until February 20, when the Snyder herd was counted and it was found that there were 80 or 100 head more than belonged to the herd. He then supposed they were the Williams' sheep.

Several witnesses testified to acquaintanceship with Williams; that he was engaged in some kind of stock business and had gotten into some trouble; that he was said to be at the time a fugitive from justice. Appellant also testified that he was somewhat acquainted with Williams, and that Williams had always dealt squarely with him. When Williams told witness he got the sheep from Nicholes, a rancher witness knew and who had purchased a ranch from Williams in January, 1926, he thought the sheep belonged to Williams. One witness testified to seeing Williams on February 2, two days before appellant claimed to have seen him; that he had gone to Williams' camp and had dinner with him; that there were some sheep there scattered out among the trees; that there was red paint on their backs.

On the morning of March 9th, two days before appellant was arrested, according to appellant's testimony, he saw one Joe Bankhead who came to appellant's cabin. Bankhead informed appellant that the La Sal Live Stock Company "was out a bunch of sheep and that Don Loveridge, Roque Garcia, and F. R. Lopez had come down there hunting them and to look us over." Appellant went over to see them. Loveridge told him they had tracked a bunch of sheep around the east end of the mesa and into the Snyder herd. The next day both appellant and Snyder were arrested, as before stated.

The state relies on many circumstances which it contends are incriminating and sufficient to sustain the verdict, among which are the following The connection of appellant with the Snyder herd; the fact that appellant used horses and mules in his employment and that the tracks of a horse or horses and mules were found trailing the stolen sheep; the fact that appellant, by virtue of his employment and opportunities in connection therewith, ought to have known that the La Sal Company's sheep were in the Snyder herd, and that his pretended ignorance thereof was inexcusable; and, above all, his pretended explanation of how the La Sal Company's sheep happened to be in the Snyder herd, which explanation was different from, and inconsistent with, his story as detailed at the trial of the case.

There can be no doubt that appellant's statement to the La Sal Company's employees concerning the stolen sheep the day before he was arrested is inconsistent with his story as detailed in court. For instance, when his attention was called to the condition of the brands on the sheep of the La Sal Company, found in the Snyder herd, he said they had lost some sheep the year previous and had concluded to brand the herd all over again; that they commenced to brand them and had run out of paint. In his explanation to these men, nothing was said about Ed Williams and the bunch of sheep he was supposed to put in the herd. When asked why he did not tell Don Loveridge about the Ed Williams' connection, his answer was, "I would be a pretty bird to squeal on a fellow." Such answers as these were well calculated to prejudice the minds of a jury of laymen and cause them to believe that the defendant was guilty.

If appellant had been found in the exclusive possession of the sheep in the Snyder herd or in such control thereof as to convince the mind to a moral certainty that he must have stolen the sheep, or had some conscious connection therewith, then his inconsistent statements and unsatisfactory explanation would be a long step

towards making a case for the jury. But when we consider the fact that Snyder, as owner, was in possession of the herd; that he was actively in charge, as shown by the evidence, that Abelardo Vijil was herder until February 3, 1926; that Antonio Lopez succeeded him on that date and was herder down to the date of appellant's arrest, and when we consider the further fact that each and every one of these men had equal, if not greater, opportunity to commit the crime charged than the appellant, the question is, Can it be said as a matter of law that the evidence is sufficient to sustain the verdict? As stated in appellant's brief, if the Snyder herd had belonged to appellant and the stolen sheep had been branded with his brand, the evidence would be far more convincing and probably be held sufficient to support a conviction. While motive is not always an essential element in proof of guilt, yet, when the evidence is otherwise insufficient and unsatisfactory, motive may become a controlling factor. In the case at bar, no motive is disclosed why appellant should have branded the stolen sheep with Snyder's brand and put them into Snyder's herd. There does not appear to be any evidence of appellant's having done any branding of the sheep at all, while it does appear that early in February, 1926, Snyder and Lopez branded about 60 head of sheep at their corral with a red daub. This was done with a paint can covered over one end with a piece of cloth, just the same as was apparently used in branding the La Sal Company's sheep. These sheep were found in the Snyder herd by the employees of the La Sal Company, together with the can used in the branding. These particular sheep, however, were not identified as belonging to the La Sal Company.

In the absence of any direct evidence tending to show that appellant participated in marking or branding the stolen sheep, or had any knowledge thereof, or that he had any knowledge that they had been stolen, it seems to us that the law controlling the case is that

which relates to recently stolen property claimed to have been found in possession of the accused. The following authorities relied on by the state or to the effect that whether or not the explanation of the accused concerning his possession of recently stolen property is satisfactory, is a question for the jury. *State* v. *Gurr*, 40 Utah 162, 120 P. 209, 39 L. R. A. (N. S.) 320; *State* v. *Hitesman*, 58 Utah 262, 198 P. 769; 25 Cyc. 138. There can be no doubt that the rule announced in the cases referred to is correct as applied to the facts of those cases. In those cases the possession of the property by the accused was exclusive. The cases therefore have no application. The rule applicable here is stated in 25 Cyc. 139, as follows:

"The possession of defendant must be personal and exclusive, for the reason that such possession alone indicates that the goods have come to the possessor by his own act or with his consent."

This we believe is the general rule. There are no doubt exceptions, but we have found none that would include a case like the one at bar.

In 17 R. C. L. at page 73, it is said:

"The general rule that the possession of stolen property is evidence of guilt is limited by the rule that to warrant an inference of guilt it must further appear that the possession was personal, and that it involved a distinct and conscious assertion of possession by the accused. It would be pushing the rule too far to require of one accused of crime an explanation of his possession of the stolen property, when possession could also, with equal right, be attributable to another. Hence the mere fact of finding stolen articles on the premises of a man of a family or in a place in which many others have free access without showing his actual conscious possession thereof discloses only a prima facie constructive possession and is not such a possession as will justify an inference of guilt by reason thereof. But the sense of the term 'possession' in this connection is not necessarily limited to custody about the person. It may be of things elsewhere deposited but under the control of a person. It may be in a storeroom or barn when the accused has the key. In short, it may be in any place where

it is manifest it must have been by the act of the party or his un-doubted concurrence."

Underhill on Criminal Evidence (2d Ed.) at page 527, states the rule as follows:

"Not only must the possession be recent, but it must be personal, exclusive, and with a distinct, implied or express assertion of owner-ship. If these essentials are not proved, a conviction based on the fact of possession must be set aside. The possession of the stolen property is personal and exclusive if it is exclusive as to all persons not particeps criminis. As to accomplices, the possession of one is the possession of all. A, mere constructive possession is not enough. The accused will not be presumed to have stolen articles which he does not know he possesses. If other persons have equal right and facil-ity of access with him to a room, trunk, or closet where stolen goods are discovered, possession, not being exclusive or personal, is of no value as evidence."

See, also, 8 Encylopedia of Evidence, 103.

In *State* v. *Moss*, 95 Or. 616, 182 P. 149, a case involving a similar question, the opinion is illuminating and supports the rule announced by the authorities above referred to. Many authorities to the same effect are stated in the opin-ion. The opinion on rehearing is reported in 188 P. 702.

In *State* v. *Crawford*, 59 Utah 39, 201 P. 1030, this court had under review the question we are now considering. The court gave sanction to the rule above stated.

In view of that decision and the authorities cited in the opinion, we deem it unnecessary to refer to other authority. These authorities, of course, are not conclusive where there is other evidence of an incriminating nature tending to con-nect the accused with the commission of the crime. If there is such evidence in the case at bar, we have been unable to find it.

It ought not be contended that the fact that defendant was connected with the Snyder herd as an employee is in itself

incriminating; nor is the fact that mules and horses were used in connection with the business and that the tracks of mules and horses were found trailing the stolen sheep. No comparions of such tracks was made and no identity established. Whoever stole the sheep, or drove them, in all probability used mules and horses, and it cannot be contended that such use was at all uncommon. In fact there is affirmative evidence in the case to the effect that other persons used horses and mules over the range in question. What is here said with reference to the tracks of mules and horses applies with equal force to the boot and shoe tracks referred to in the evidence. No comparison was made and no identity established or attempted to be established, and we know of no reason why such attempt was not made. It no doubt would have materially strengthened the case of the state if the tracks had been compared and shown to correspond with the tracks of defendant and tracks made by the mules and horses used by him in the performance of his duities. In such case the question as to whether his possession was exclusive would not necessarily have been a controlling factor.

And further, in conclusion it may be said the statement of the defendant as to why the sheep were branded as they were, although inconsistent with his testimony given at the trial, was nevertheless not in any sense an admission of guilt.

The trial court evidently was not strongly impressed with the belief that the defendant was guilty, for, in passing on the admissibility of the testimony of the witness Redd, as to what was said by Snyder when defendant was not present, the court said:

"I am not certain in my mind whether the evidence is admissible or not in this case, but the uncertainty which I feel in regard to the matter arises by reason of my uncertainty in regard to the strength of the state's case altogether."

We are of the opinion the evidence was insufficient to sustain the verdict, and for that reason the court erred in not granting appellant's motion for a directed verdict. It likewise erred in not granting his motion for a new trial.

The judgment is therefore reversed, and the cause remanded for a new trial.

CHERRY, HANSEN, and GIDEON, JJ., concur.

STRAUP, J. I concur in the reversal of the judgment on the ground of insufficiency of the evidence to support the verdict.

I dissent from the ruling admitting in evidence the conversation between Snyder and witness, Redd. When the matter first came up, and when the state sought to elicit testimony respecting the conversation had, not in the presence of the accused, the defendant interposed an objection thereto on the ground that the testimony called for was hearsay and incompetent. The state claimed the testimony competent on the theory that Snyder and the accused were coconspirators in a conspiracy to steal the sheep, the subject of the larceny. Manifestly, whatever was then said by Snyder was long after the completion of the claimed unlawful enterprise, and not in pursuance, or in furtherance, or during the pendency of it. Thus, I am of the opinion that the objection was well taken. The trial court then so ruled, but more largely based the ruling on the ground that the concerted action of Snyder and the accused in the commission of the crime had not yet been sufficiently shown. So, after the state adduced further evidence concerning the commission of the offense, it then recalled the witness Redd, and, after showing by him that he several months after the commission of the crime had a private conversation with Snyder and when no one else was present, and asked the witness to state, "Q. What was said" between him and Snyder in such conversation? Counsel for the accused again objected on the same ground as theretofore. Thereupon con-

siderable discussion was had as to the competency of the testimony. At the conclusion of the discussion the court overruled the objection and permitted the witness to answer. Thereupon the witness answered as set forth in the prevailing opinion. On the motion for a new trial, the trial court ruled that error was committed in receiving the testimony but that the ruling was not prejudicial. On a review of the matter, this court holds that the answer made by the witness was not responsive to the question propounded to the witness by counsel for appellant, and therefore counsel ought to have made a motion to strike the answer of the witness, and, not having done so, cannot now be heard to complain. I dissent from that holding.

The rule quoted in the prevailing opinion from 28 R. C. L., in my judgment, is not applicable to the situation. I think the matter here involved is not within the rule there stated.

The question propounded to the witness by the state, the objection to which was overruled, related to a conversation had between the witness and Snyder admittedly not in the presence of the accused and long after the commission of the offense, and not in pursuance, or in furtherance or during the pendency of the unlawful enterprise, and with respect thereto the state asked the witness to state "what was said" in such conversation, not only by Snyder, but also by the witness. The objection being overruled, the witness proceeded to answer the question. In doing so, he stated that Snyder asked him if he was sure the witness had lost some sheep, and that the witness answered he was pretty sure he had. Thereupon counsel for the accused requested the witness "to state that slow," whereupon the witness answered that he was not sure that what he had said were the exact words. Thereupon counsel asked him if he was giving it as he remembered it. To this the witness answered, "Yes, sir." Then counsel asked the witness what he stated to Snyder in reply. The witness then proceeded to state the whole conversation, what Snyder said and what the witness said. Hence what the witness testified to was in response,

not only to the question asked by the state, but also was responsive to what counsel for the accused was asking the witness.

But the matter lies deeper than that. The state, by its question propounded to the witness, "What was said?" opened the door to the entire conversation. After the objection was overruled, the state could not elicit only a part of the conversation and bar the accused from eliciting the whole of it. Nor can it successfully be contended that when improper testimony is received, over timely objections, the party against whom it is received waives his objections by cross-examining or otherwise interrogating the witness concerning the matter opened up by his adversary. For the rule is that one who has brought out improper testimony on the examination in chief of his witness cannot complain of a cross-examination of the witness on the same subject. 40 Cyc. 2496. And the rule is just as well settled that, when on direct examination a part of a conversation or transaction is elicited the opposing party on cross-examination may elicit the whole of it. 40 Cyc. 2491. What counsel for the accused elicited directly related to the subject inquired about and opened up by the state. So we come back to the proposition of whether the timely objections interposed by counsel for the accused were properly overruled. For the reasons already stated, I am clearly of the opinion that the court erred in such ruling and that whatever harm was occasioned by the testimony was the result of such ruling. I also am of the opinion that the testimony was prejudicial. However, inasmuch as the case must be reversed on the ground of insufficiency of the evidence to support the verdict, it is unnecessary to express an opinion as to whether the improper testimony was of such prejudicial effect as alone to require a reversal of the judgment. But, as the case is remanded for a new trial, I think it proper that we express an opinion as to the competency of the testimony so proffered by the state and received in evidence over the objections of the accused. That I have done.